## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**AARON GARRET, as the Wrongful Death**
**Personal Representative for the**
**Estate of Andres Maytorena Grado, deceased**

Plaintiff**,**

**v.**                                                          **No. _____**

**BOARD OF COUNTY COMMISSIONERS**
**OF THE COUNTY OF EDDY, NEW MEXICO,**

**SHERIFF MARK CAGE,**
individually and in his official capacity,

**WARDEN BILLY MASSINGILL**,
Individually and in his official capacity,

**LT. ROGER MAXWELL,**
individually and in his official capacity,

**SERGEANT ANTHONY PONCE,**
individually and in his official capacity,

**DETENTION OFFICER JOEL PARRAZ,**
individually and in his official capacity,

**DARLA BANNISTER, ACNP,**

**SYLVIA J. MARIN, R.N., and**

**CORRECT CARE SOLUTIONS, LLC,** a
Foreign Liability Company,

        Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS AND TORTIOUS CONDUCT RESULTING IN THE WRONGFUL DEATH OF ANDRES GRADO

        COMES NOW Plaintiff Aaron Garrett, the duly appointed Wrongful Death Personal

Representative of Andres Grado, Deceased, by and through counsel, The Spence Law Firm NM,

LLC (Dennis K. Wallin and Alisa C. Lauer), and for his Complaint states:

## JURISDICTION AND VENUE

1.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1367, and by 42 U.S.C. §§ 1983 and 1988.

2.     Plaintiff's claims arise out of events that occurred exclusively in Eddy County and the State of New Mexico, and within the United States District of New Mexico.

## PARTIES

3.     **Andres Grado** was a 30-year-old man who was an inmate in the custody, care, and control of the Eddy County Detention Center (or "ECDC") on January 3, 2019, which directly resulted in his death.

4.     At all times pertinent hereto, Andres Grado was a resident of Eddy County, New Mexico.

5.     **Plaintiff Aaron Garrett** is the Wrongful Death Personal Representative of Andres Grado's Estate duly appointed to serve in that capacity pursuant to laws of the State of New Mexico, and in such capacity, brings this action on behalf of all statutory beneficiaries of the Estate of Andres Grado and in accordance with Sections 41-2-1 through 41-2-3 NMSA.

6.     **Defendant Board of County Commissioners of the County of Eddy ("Eddy County")** is, and at all relevant times was a political subdivision of the State of New Mexico, and the duly elected and lawfully serving governing body of Eddy County, New Mexico, and acted through its employees and agents who operated and served at the ECDC.

7.     Defendant Eddy County is a "person" under 43 U.S.C. § 1983.

8.     At all times material to this Complaint, Eddy County was the employer or contractor of the individual Defendants.

9.     **Defendant Sheriff Mark Cage** was, at all material times to this lawsuit, employed as the Sheriff of Eddy County, in Eddy County, New Mexico, and was responsible for oversight and management of the ECDC.

10.     Defendant Sheriff Cage is sued in both his individual capacity and his official capacity as Sheriff of Eddy County. He was acting under the color of state law and within the scope of his employment at all material times.

11.     **Defendant Billy Massingill** is an individual, and was at all material times employed as the Warden of ECDC in Eddy County, New Mexico.

12.     Defendant Massingill is sued in both his individual capacity and his official capacity as Warden of ECDC. He was acting under color of state law and within the scope of his employment at all material times.

13.     **Defendant Lt. Roger Maxwell** is an individual who, at all material times, was an employee of Eddy County serving as a lieutenant detention officer at ECDC, in Eddy County, New Mexico, and who supervised the detention officers who performed acts giving rise to this matter and oversaw and participated in acts giving rise to this matter.

14.     Defendant Lt. Maxwell is sued in his individual and official capacities. He was acting under color of state law and within the scope of his employment at all material times

15.     **Defendant Sgt. Anthony Ponce** is an individual who, at all material times, was an employee of Eddy County serving as a sergeant detention officer at ECDC, in Eddy County, New Mexico, and who supervised at least one other detention officer who performed acts giving rise to this matter and oversaw and participated in acts giving rise to this matter.

16.     Defendant Ponce is sued in his individual and official capacities. He was acting under color of state law and within the scope of his employment at all material times.

17.     **Defendant Joel Parraz** is an individual who, at all material times, was an Eddy County employee serving as a detention officer at ECDC in Eddy County New Mexico, and who performed and participated in the acts giving rise to this matter.

18.     Defendant Parraz is sued in his individual and official capacities. He was acting under color of state law and within the scope of his employment at all material times.

19.     **Defendant Darla Bannister, ACNP,** is an individual and was at all material times the Medical Director of ECDC acting under private contract with Eddy County and providing professional medical services as a Nurse Practitioner pursuant to New Mexico licensure. Defendant Bannister was ultimately responsible for all clinical decisions and actions concerning incarcerated individuals' health care needs, per the terms of her contract with Eddy County.

20.     Defendant Bannister, at all material times, participated in the actions giving rise to this matter, or was the employer or supervisor of employees who participated in actions giving rise to this matter.

21.     Defendant Bannister was contractually responsible for the provision and oversight of health care at ECDC during the events material to this complaint.

22.     **Defendant Sylvia Marin, R.N.,** is an individual and was at all material times a Registered Nurse providing medical services at ECDC pursuant to New Mexico licensure. Upon information and belief, she was employed by a private contractor to provide professional medical services at ECDC.

23.     **Defendant Correct Care Solutions, LLC, ("Correct Care")** is a Foreign Profit Corporation. Defendant Correct Care does not have a registered agent in New Mexico. It is incorporated in Tennessee, and its principal place of business is 1283 Murfreesboro Road, Nashville, Tennessee 37217. At all material times, Defendant Correct Care was operating under a

contract or contracts and contract extensions it entered into with the Board of Commissioners of Eddy County, New Mexico, to provide comprehensive healthcare services to the inmates of ECDC, in Eddy County, New Mexico, and was acting through its employees and agents, as well as directly acting and failing to act.

24.     Defendant Correct Care was, at all material times, the employer of healthcare providers who participated in the actions giving rise to this matter.

25.     Defendant Correct Care was contractually responsible for the provision and oversight of health care at ECDC during the events material to this complaint.

## **FACTUAL BACKGROUND**

26.     Incident reports of the Artesia Police Department indicate that Andres Grado was arrested at approximately 1:00 p.m., on December 31, 2018, on misdemeanor charges stemming from allegations he had thrown a stick at the window of a vehicle and kicked the vehicle's mirrors.

27.     Arrest reports indicate Andres showed signs of intoxication and was tased by officers after he tried to remove his clothes and yelled at them.

28.     Upon arrest, he was taken to the hospital for medical clearance prior to being detained at Artesia Detention Center and then Eddy County Detention Center.

29.      The hospital records indicate Andres had been drinking and list "alcohol dependence with intoxication" as a problem.

30.     ECDC records show that Andres was booked into the Eddy County Detention Center on January 2, 2019, at 6:15 p.m.

31.     Defendant Marin told a New Mexico State Police investigator that she conducted the medical intake of Andres on January 2, 2019.

32.     Defendant Marin told the State Police investigator that she had memorized all intake questions and that Andres answered them properly.

33.     Defendant Marin told the State Police investigator that she asked Andres if he was under the influence of alcohol or drugs when he was arrested and that he replied, "yes I was drunk."

34.     The Eddy County Medical/Mental Health Screen of Andres, signed by Defendant Marin on January 2, 2019, states that Andres was under the influence of alcohol.

35.     The Eddy County Medical/Mental Health Screen of Andres, signed by Defendant Marin on January 2, 2019, states that he used alcohol daily for nine years.

36.     Eddy County Detention Center Policy and Procedure on Health Screens requires inquiry into the use of alcohol, "amount, frequency, date/time of last use, and symptoms experienced upon withdrawal (e.g. convulsions)."

37.     Eddy County Detention Center Policy and Procedures on Detoxification (Detoxification Policy and Procedures) state that qualified health care professionals will provide care to newly incarcerated individuals that enter the system with alcohol withdrawal.

38.     The Detoxification Policy and Procedures require qualified health care professionals to keep detainees at risk for progression to more severe levels of withdrawal "under constant observation," and when severe withdrawal symptoms are observed, a physician is to be notified immediately.

39.     The Detoxification Policy and Procedures require ambulatory detoxifying detainees "be placed in an area where close observation is available."

40.     The Detoxification Policy and Procedures provide: "During the receiving screening process if a detainee reports a substance abuse condition, the health care provider will initiate an alcohol/drug withdrawal flow sheet. During the first four days of his/her incarceration the detainee

will be assessed daily for signs and symptoms of withdrawal. Should abnormal signs be identified, the physician is consulted promptly."

41.     The Detoxification Policy and Procedures provide: "Those detainees processed into the detention center (booked) who are under the influence of alcohol or drugs shall be separated from the general population and kept under close supervision for a reasonable period of time."

42.     The Detoxification Policy and Procedures provide: "Communication and coordination is evident between medical, mental health, and classification regarding the care and treatment of these detainees."

43.     The Detoxification Policy and Procedures provide: "The Program Administrator or designee will determine when a detainee is to be released from medical isolation."

44.     The Detoxification Policy and Procedures provide: "Medical and detention staff is trained to recognize the signs and symptoms of alcohol . . . withdrawal. Detainees who report or are observed to be in acute physical withdrawal should be referred to the county physician for medical detoxification supervision."

45.     Defendants actually knew, or should have known, that alcohol withdrawal can result in serious bodily injury or death.

46.     The State Police's investigative report indicates Andres was housed in a cell with another inmate.

47.     The State Police's investigative report and Defendant Marin's report indicate that on January 3, 2019, Andres was exhibiting signs and symptoms of a mental break or delirium tremens, including talking to himself, hallucinating, thinking he was in a video game, and becoming aggressive.

48.     The State Police's investigative report and Sgt. Alicia Moreno's incident report indicates Andres was in a physical altercation with his cellmate after Andres was talking to the walls.

49.     The State Police's investigative report and Sgt. Alicia Moreno's incident report indicate that Andres asked for medical help and the cellmate used the intercom to call for help.

50.     The State Police investigative report indicates that Defendant Parraz stated that at approximately 7:33 p.m., he observed the alert button for Andres's cell was activated and asked the inmates what was going on.

51.     Defendant Parraz told the State Police investigator that he heard a response of, "Help, we need help, can you come in, and get medical."

52.     The State Police investigative report indicates that Defendant Parraz responded and that he observed Andres lying on his side and screaming for medical assistance.

53.     The State Police investigative report indicates that Defendant Parraz stated that he called for medical help via radio twice and after not receiving a response from medical, returned to his post in the control room and turned off all televisions and telephones to make the inmates return to their cells.

54.     Defendant Parraz told the State Police investigator that Defendant Marin met him in the control room and the two went to the day room to ensure all inmates were locked down.

55.     The State Police investigative report indicates that Defendant Parraz stated that after he finished ensuring all inmates were locked down, Defendant Parraz noticed that Defendant Marin had entered the cell of Andres and his cellmate without him.

56.     The New Mexico State Police's investigative report indicates Defendant Marin stated she observed that Andres was having a hard time breathing, was pale, and was not

responding verbally, and observed his pupils were dilated.

57.     Defendant Marin told the State Police investigator that Andres's cellmate kept repeating that "he had been acting weird all day, he thinks he is in a video game and talking about this girl."

58.     The State Police investigative report indicates that, while responding to Andres's medical condition, Defendant Parraz and Defendant Marin commented that Andres was an alcoholic and that he was detoxing.

59.     The New Mexico State Police's investigative report indicates Defendant Marin stated she told Andres, "I thought you were not going to have any alcohol withdrawals," and he smiled.

60.     Defendant Maxwell's incident report indicates that he was working as shift supervisor and went to Andres's cell to check on what was happening, and that when he arrived he saw Defendant Marin talking to Andres.

61.     Defendant Maxwell's incident report indicates that Defendant Marin advised him that she thought Andres might be withdrawing.

62.     The State Police investigative report indicates Defendant Maxwell said he left to locate a cell on the lower floor so that Andres could be watched medically.

63.     The State Police investigative report indicates Defendant Parraz stated he observed Defendant Marin was having difficulty obtaining Andres's vital signs because he was moving so much.

64.     Sgt. Alicia Moreno's incident report indicates that Andres's cellmate observed Andres beginning to blackout and at that point Andres started to grab the nurse by her hand and Defendant Parraz then began to handcuff and hold him down.

65.     Defendant Parraz's Use of Force Report indicates that he restrained Andres in handcuffs because Andres was in a seizure mode and was incoherent.

66.     The State Police investigative report indicates that Defendant Parraz enlisted Andres's cellmate to gain control of Andres's arm and then handcuffed his arms behind his back.

67.     Defendant Parraz stated in his incident report that he grabbed Andres by the side of his jumpsuit to flip him on his stomach  and that when he had Andres on his stomach, he proceeded to restrain his legs by pulling his feet up to his lower back.

68.     The manner in which Andres was restrained has long been known to cause positional asphyxia, serious bodily injury, and death, and is prohibited by Constitutions of the United States and the State of New Mexico, as well as by regulations, policies, and protocols.

69.     The manner in which Andres was restrained was known to Defendants,  or should have been known, to be prohibited by Constitutions of the United States and the State of New Mexico, as well as by regulations, policies, and protocols.

70.     The manner in which Andres was restrained was known to Defendants, or should have been known, to cause positional asphyxia, serious bodily injury, and death.

71.     Defendant Parraz stated in his incident report that, while he had Andres restrained on his stomach with his feet pulled up to his lower back, he radioed Defendant Maxwell.

72.     Defendant Parraz stated in his incident report that he held Andres down to the floor until Defendant Maxwell and Defendant Ponce arrived.

73.     Defendant Maxwell stated in his incident report that he returned and saw Defendant Parraz had Andres handcuffed in the front and positioned on his belly and was holding his legs.

74.     Defendant Maxwell's incident report indicates that he called for assistance and to obtain leg restraints.

75.     The State Police's investigative report indicates that Defendant Maxwell notified Defendant Ponce to go to Andres's cell.

76.     The State Police's investigative report indicates that Defendant Ponce stated that when he arrived, he observed Defendant Marin and Defendant Parraz on top of Andres, that Andres was on his belly, that Defendant Parraz was on top of Andres's legs, and that Andres's legs were crossed and brought up to his back.

77.     Defendant Ponce said that he advised Defendant Parraz he would watch Andres's upper body while Defendant Parraz watched Andres's lower body.

78.     Defendant Ponce said he twice instructed Defendant Marin to check Andres because he did not think he was breathing.

79.     Defendant Ponce said Defendant Marin refused both times.

80.     Defendant Ponce, Defendant Parraz, and other officers noticed Andres had urinated.

81.     When Defendant Ponce observed Andres urinating he advised Defendant Marin to check on him again.

82.     Defendant Marin indicated she suspected Andres was having seizures and she checked for vital signs.

83.     Defendant Marin found Andres was not breathing and had no pulse.

84.     Defendant Parraz was advised to turn Andres over.

85.     Defendant Marin told the State Police investigator that when Andres was flipped over, he had foam around his mouth and was not breathing.

86.     Defendant Parraz stated in his incident report that he did not unhandcuff Andres until after Defendant Marin discovered he had no pulse and that that they needed to commence the process of CPR.

87.     The State Police investigative report indicates that Andres's cellmate offered to give him mouth-to-mouth resuscitation because Defendants Parraz and Marin and other ECDC personnel did not have mouth guards and did not want to perform it.

88.     Defendants' administration of chest compressions were unsuccessful in resuscitating Andres.

89.     Defendant Maxwell did not contact control to call 911 until approximately 8:02 p.m.

90.     The Emergency Medical Service (EMS) report indicated it was contacted at 8:02 p.m., and arrived at 8:07 p.m.

91.     After performing emergency services to attempt to resuscitate Andres, EMS transported him to Carlsbad Medical Center.

92.     He was flown to University Medical Center in Lubbock, Texas, for a higher level of care.

93.     The State Police investigative report indicates that when Defendant Massingill learned Andres would be transported to Lubbock for medical care, he contacted a judge to have Andres released on his own recognizance so that he would not have to send one of his officers with Andres or have to deal with shift scheduling issues and financial issues.

94.     Andres Grado died on January 4, 2019.

95.     The Death Investigation Report indicated that he suffered from alcohol withdrawal.

96.     The Death Investigation Report indicated that an individual in alcohol withdrawal can experience high blood pressure, insomnia, hallucinations, high fever and excessive sweating, seizures, and delirium tremens.

97.     Upon information and belief Andres Grado suffered from alcohol withdrawal and died due to positional asphyxiation.


## COUNT I

**USE OF EXCESSIVE FORCE IN VIOLATION OF ANDRES GRADO'S PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS PROTECTED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE II, SECTIONS 13 AND 18 OF THE CONSTITUTION OF THE STATE OF NEW MEXICO**

**(Defendants Eddy County, Sheriff Cage, Warden Massingill, Lt. Maxwell, Sgt. Ponce, Officer Parraz)**

98.     Plaintiff restates each of the preceding allegations as if fully stated herein.

99.     Andres Grado was a pretrial detainee housed at ECDC.

100.     Andres had procedural and substantive due process rights protected by the Fourteenth Amendment to the Constitution of the United Sates to be free from excessive force as a pretrial detainee.

101.     Andres had the right to be free of cruel and unusual punishment as a pretrial detainee protected by Section 13, of Article II of the Constitution of the State of New Mexico.

102.     Andres had due process rights to be free from excessive force as a pretrial detainee protected by Section 18, of Article II of the Constitution of the State of New Mexico.

103.     Defendants acted individually and in concert using wholly unnecessary excessive force to restrain Andres in a facedown position, with his wrists restrained in handcuffs, while compressing his chest and crossing and bending his legs up to his back until he asphyxiated.

104.   The restraint used is well known to cause positional asphyxia likely to result in great bodily injury or death.

105.   The restraint used is prohibited by law, including by the Fourteenth Amendment to the Constitution of the United States.

106.   The force used was not necessary.

107.   The force used was objectively unreasonable.

108.   The means by which Defendants restrained Andres violated his procedural and substantive due process rights protected by the Fourteenth Amendment to the Constitution of the United States to be free from excessive force.

109.   Andres's constitutional right to be free from the means of force used is clearly established.

110.   Defendants violated Andres's Fourteenth Amendment freedom from excessive use of force by a government actor. As a result of Defendants' objectively unreasonable use of force, Andres was asphyxiated and ultimately died. Defendants acted unreasonably and applied force that vastly exceeded any possible, perceived need when they restrained Andres by handcuffing him, flipping him on his stomach, putting pressure on his back and pulling his legs up toward his back and maintaining that position while Andres was not resisting and until his distress was apparent by the fact that he urinated and had no pulse, and ultimately killing him, particularly in light of the fact that he was incarcerated on minor misdemeanor charges, and that he was suffering a health crisis emanating from ethanol withdrawal that was known or should have been known at the time of restraint. Defendants' use of force was also objectively unreasonable because Andres was in his cell, had called for medical assistance, and needed medical assistance to address his condition.

111.    Defendants caused Andres to asphyxiate and die by forcing him into a prone, face-down, position, with his legs bent up to his back and his hands handcuffed, even though he was visibly unable to breathe, was losing consciousness, and urinated himself. Defendants intentionally prevented Andres from breathing and failed to release him from the restraint that is known to cause death until after he had no pulse and Defendants needed to commence CPR.

112.    The means by which Defendants restrained Andres also violated his rights under Sections 13 and 18, of Article II of the Constitution of the State of New Mexico.

113.    As a proximate and foreseeable result of Defendants' violation of Andres's procedural and substantive due process rights protected by the Fourteenth Amendment to the Constitution of the United States to be free from excessive force, and his rights protected by the Constitution of the State of New Mexico, Andres suffered death, physical injuries, exacerbation of his medical condition, loss of chance, pain and suffering, and emotional distress.

### COUNT II

**VIOLATION OF ANDRES GRADO'S DUE PROCESS RIGHTS TO HUMANE CONDITIONS OF CONFINEMENT AND ADEQUATE MEDICAL CARE PROTECTED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE II, SECTIONS 13 AND 18, OF THE CONSTITUTION OF THE STATE OF NEW MEXICO**

**(Defendants Eddy County, Sheriff Cage, Warden Massingill, Lt. Maxwell, Sgt. Ponce, Officer Parraz)**

114.    Plaintiff restates each of the preceding allegations as if fully stated herein.

115.    Andres Grado had a right to humane conditions of confinement and adequate medical care that was protected by the Fourteenth Amendment to the Constitution of the United States.

116.    Andres had the right to be free of cruel and unusual punishment as a pretrial detainee protected by Section 13, of Article II of the Constitution of the State of New Mexico.

117.   Andres had due process rights to be free from excessive force as a pretrial detainee protected by Section 18, of Article II of the Constitution of the State of New Mexico.

118.   Defendants knew Andres had been transported to ECDC after having been hospitalized and receiving medical care, including care for alcohol dependence with intoxication.

119.   Discharge instructions the hospital provided to ECDC advised to "seek care immediately or call 911 if" the patient has "sudden trouble breathing or chest pain," has "a seizure," has "hallucinations (. . . see[s] or hear[s] things that are not real)", or "cannot stop vomiting."

120.   Andres experienced trouble breathing and chest pain, hallucinations, and a seizure.

121.   Andres had no means by which to contact emergency healthcare providers or seek healthcare services of any kind.

122.   Andres was completely dependent on Defendants for his medical care needs.

123.   Defendants did not summon emergency care when Andres exhibited signs of being in a health crisis.

124.   Instead of seeking proper emergency treatment and care, Defendants restrained Andres in a position known to cause asphyxia and death.

125.   Although it was clear to defendants that Andres was suffering a health care emergency by at least 7:33 p.m., Defendants did not summon emergency care until 8:02 p.m., after Andres involuntarily urinated and was determined not to be breathing or have a pulse.

126.   Moreover, had defendants followed the jail policies relating to detoxification, they would have observed Andre's abnormal behavior even earlier in the day requiring them to notify a physician.

127.     Defendants' improper decision-making, delayed action, and inaction in failing to address Andres's medical needs were based on placing concerns for staffing, shift scheduling issues, and finance or economic issues above Andres's need for appropriate medical care.

128.     Defendants were deliberately indifferent to Andres's serious and obvious medical condition and needs.

129.     Defendants' deliberate indifference to Andres's serious and obvious medical condition and needs violated his right to humane conditions of confinement and adequate medical care protected by the Fourteenth Amendment to the Constitution of the United States.

130.     Andres's constitutional right to humane conditions of confinement and adequate medical care is clearly established.

131.     Defendants violated Andres' right to substantive and procedural due process. Defendants had a duty to refrain from acting with deliberate indifference to Andres's serious and obvious medical condition and needs, particularly considering that they caused his most serious and lethal medical condition and needs. They intentionally shirked their duty and intentionally endangered him when they restrained him in a prone position, face down, while handcuffed and bent his legs up to his back until he had no pulse and urinated himself; failed to release him until they caused him to asphyxiate and die; responded to his medical crisis by restraining him a position known to cause asphyxiation and death. Defendants were aware of Andres's serious medical needs and risk of serious injury and death, but they consciously refused to act until after he was unconscious, had urinated himself, and had no pulse.

132.     Defendants caused Andres to asphyxiate and die by forcing him into a prone, face-down, position, with his legs bent up to his back and his hands handcuffed, even though he was visibly unable to breathe, was losing consciousness, and urinated himself. Defendants intentionally

prevented Andres from breathing and failed to release him from the restraint that is known to cause death until after he had no pulse and Defendants needed to commence CPR.

133.     Defendants' acts and omissions also violated Andres's rights under Sections 13 and 18, of Article II of the Constitution of the State of New Mexico.

134.     As a proximate and foreseeable result of Defendants' deliberate indifference to Andres's serious, obvious medical condition, in violation of his rights protected by the Fourteenth Amendment to the Constitution of the United States, and his rights protected by the Constitution of the State of New Mexico, Andres suffered death, physical injuries, exacerbation of his medical condition, loss of chance, pain and suffering, and emotional distress.

## COUNT III

## CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS

### (Defendants Eddy County and Sheriff Cage)

135.     Plaintiff restates each of the preceding allegations as if fully stated herein.

136.     Defendants Eddy County and Sheriff Cage were responsible for operating ECDC.

137.     Defendants responsible for operating ECDC delegated the responsibilities of making and implementing policies for, and managing operations at ECDC to Defendant Massingill.

138.     Pursuant to state law, jail administrators acting in their official capacity are regarded as the final policy makers of their respective institutions.

139.     Defendant Massingill was the final policy maker responsible for the hiring, training, and supervision of ECDC employees.

140.     Defendant Massingill's customs, policies, and practices were those of Defendants Eddy County and Sheriff Cage.

141.    Defendant Massingill practiced and operated under customs, policies, and practices of acting with deliberate indifference to the medical care and needs of inmates at ECDC, including Andres Grado.

142.    Defendant Massingill's customs, policies, and practices created an environment where staff were deliberately indifferent to inmates with conditions like those of Andres Grado, and to his condition.

143.    Defendant Massingill practiced and operated under customs, policies, and practices of permitting unconstitutional restraint of inmates.

144.    The customs, policies, and practices of Defendant Massingill created a climate within ECDC where staff considered the use of unconstitutional restraint an acceptable practice and engaged in unconstitutionally restraining inmates.

145.    While Andres Grado was detained at ECDC, detention officers and medical staff followed the customs, policies, and practices put in place by Defendant Massingill.

146.    Defendant Massingill's customs, policies, and practices resulted in the violation of Andres's Grado's clearly established constitutional right to humane conditions of confinement and adequate medical care.

147.    Defendant Massingill's customs, policies, and practices resulted in the violation of Andres Grado's clearly established procedural and substantive due process rights to be free from excessive force protected by the Fourteenth Amendment to the Constitution of the United States.

148.    As a proximate and foreseeable result of Defendants' customs, policies, and practices,  and their hiring,  supervision,  and training decisions that violated the Fourteenth

Amendment to the Constitution of the United States, Andres suffered physical injuries, exacerbation of his medical condition, loss of chance, pain and suffering, emotional distress, and wrongful death.

## COUNT IV

### BATTERY AND NEGLIGENT SUPERVISION RESULTING IN PERSONAL INJURY AND WRONGFUL DEATH UNDER THE NEW MEXICO TORT CLAIMS ACT

### (Defendants Eddy County, Warden Massengill, Lt. Maxwell, Sgt. Ponce, and Detention Officer Joel Parraz in their official capacities)

149.    Plaintiff restates each of the preceding allegations as if fully stated herein.

150.    Proper and timely notice was served on Defendants under the New Mexico Tort Claims Act.

151.    Defendants Parraz and Ponce restrained Andres Grado in a manner that they knew or should have known was likely to result in death or serious bodily injury.

152.    The restraint was an unlawful, intentional touching or application of force that resulted in personal injury.

153.    Defendant Maxwell was the supervising officer who had direct supervisory authority and responsibility to oversee the actions of Defendants Parraz and Ponce.

154.    Defendant Maxwell knew that Defendants Parraz and Ponce were restraining Andres in a manner that he knew or should have known was likely to result in death or serious bodily injury and failed to intervene.

155.    Defendants owed a duty of care not to improperly restrain Andres in a way that may result in positional asphyxia.

156.    Defendants breached their duty of care for detention officers in the same or similar circumstances.

157.     Defendants failed to follow the policies, procedures, and protocols prohibiting the restraint used on Andres.

158.     Defendants allowed, permitted, condoned, or failed to intervene with the improper restraint or battery perpetrated upon Andres.

159.     Defendants intentionally or negligently engaged in actions that disregarded the life, well-being, and safety of Andres Grado.

160.     Upon information and belief, Andres died of positional asphyxia due to the acts and omissions of Defendants.

161.     Upon information and belief, each Defendant's acts, inactions, or omissions caused or contributed to Andres's wrongful death, pain and suffering, and other damages.

<u>**COUNT V**</u>

**ORDINARY NEGLIGENCE UNDER NEW MEXICO TORT LAW**

**(Defendants Roger Maxwell, Joel Parraz, and Anthony Ponce in their individual capacities)**

162.     Plaintiff restates each of the preceding allegations as if fully stated herein.

163.     Defendants had a duty of ordinary care to reasonably ensure Mr. Grado's safety, care, and protection, to communicate foreseeable risks to his safety, care, and protection to appropriate individuals under the circumstances, and to take all reasonable measures under the circumstances to ensure his safety, care, and protection from foreseeable risks during his incarceration at ECDC.

164.     Defendants, and each of them breached their duties of care.

165.     Defendants' acts, inactions, and omissions include, but are not limited to:

- failure to timely or properly respond to calls for Andres's medical care;

- failure to monitor Andres's condition;

- failure to communicate Andres's condition to the appropriate persons or entities;

- failure to properly respond to Andres's symptoms of alcohol withdrawal;

- failure to timely and properly seek assistance from health care professionals regarding Andres's condition;

- failure to timely obtain a referral for Mr. Grado or arrange for his proper care;

- failure to timely arrange to transfer, or transfer Mr. Grado to a hospital or other appropriate facility for his care and treatment;

- improperly restraining Andres in light of known risks of asphyxiation, serious bodily injury, and death emanating from the means of restraint used;

- perpetrating an improper touching on Andres.

166. Defendants breached their ordinary standards of care.

167. Defendants' conduct constitutes negligence, recklessness, willful or wanton negligence, or intentional acts.

168. Defendants' negligence, recklessness, willful or wanton negligence, or intentional acts caused or contributed to Mr. Grado's wrongful death, pain and suffering and other damages.

169. Defendants are liable for their acts, inactions, or omissions, and for compensatory damages and punitive damages caused by their ordinary negligence.

### COUNT VI

**STATE TORTS: NEGLIGENT PROVISION OF MEDICAL CARE AND NEGLIGENT OPERATION OF A MEDICAL FACILITY**

**(Defendants Darla Bannister, Sylvia Marin, and Correct Care Solutions)**

170. Plaintiff restates each of the preceding allegations as if fully stated herein.

171. Defendants Darla Bannister and Correct Care Solutions were contracted by Eddy County to provide medical care to inmates at the ECDC, including Andres Grado.

172.    Defendants Darla Bannister and Correct Care Solutions are vicariously liable for the acts and omissions of their employees, including Sylvia Marin, R.N.

173.    Defendant Sylvia Marin, R.N., was responsible for conducting the medical intake process of Andres and providing medical care during his detention and at the time he suffered injuries resulting in his death.

174.    Defendant Marin owed a duty of care to Andres to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified medical professionals in her field.

175.    Defendants Darla Bannister and Correct Care Solutions, acting directly, as well as through their employees, agents, apparent and/or ostensible agents, contractors, failed to possess and apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified health care providers.

176.    Defendant Marin owed a duty to follow policies, procedures, or protocols for inmates suffering from or at risk for ethanol withdrawal.

177.    Defendants' negligent acts, inactions, or omissions include:

- failure to appreciate or recognize Andres's signs, symptoms, and risks of ethanol withdrawal;

- failure to follow policies, procedures, or protocols for inmates who are suffering from alcohol withdrawal;

- failure to appreciate or recognize the signs, symptoms, and risks associated with restraining a person in the manner in which Andres was restrained and that it was likely to result in positional asphyxiation and death;

- failure to render aid to an inmate with whom Defendants were obligated to provide reasonable medical care, including emergency medical care;

- failure to appreciate or recognize Andres's condition during the medical intake process, the course of Andres's detention at ECDC, and while he was improperly restrained;

- failure to properly treat Andres according to the applicable standards of care;

- active and negligent participation in the restraint that caused or contributed to Andres's death;

- failure to timely or properly respond to calls for medical care for Mr. Grado;

- failure to properly respond to Andres's chest pain, headaches, vomiting, unresponsiveness, hallucinations, and exhibition of other symptoms indicating he was at risk for serious injury or death;

- failure to properly and timely assess and treat Andres's condition;

- failure to properly and timely diagnose or give a differential diagnosis of Andres's condition;

- failure to oversee medical care for Andres;

- failure to properly monitor Andres's condition;

- failure to timely or properly consult with other health care professionals regarding Andres's condition;

- failure to act reasonably under the circumstances;

- failure to ensure Andres received reasonably proper medical care under the circumstances;

- failure to ensure Andres was not harmed as a result of Defendants' actions and inactions;

- willfully, recklessly, wantonly, or intentionally ignoring or refusing to respond to calls for medical assistance;

- willfully, recklessly, wantonly, or intentionally ignoring signs and symptoms that Andres's life and health were in grave danger, including his condition as described herein, and taking no appropriate measures that addressed that danger;

- willfully, recklessly, wantonly, or intentionally engaging in the restraint of Andres Grado by a means well known to cause positional asphyxiation and death;

178.   Defendants' actions and inactions constitute breaches of their requisite duties of care owed to Andres Grado.

179.   Defendants' actions and inaction constitute negligent provision of medical care.

180.   Defendants' actions and inaction constitute negligence in operating a medical facility.

181.   Defendants' breaches of their duties of care caused or contributed to Andres's pain and suffering, loss of chance, wrongful death, and other damages.

182.   As a direct and proximate cause of Defendants' negligent acts and omissions, Andres Grado died.

183.   Defendants' breaches of their duties of care were willful, reckless, wanton, or intentional.

184.   Defendant Marin is individually liable for compensatory damages and punitive damages for medical negligence.

185.   Defendants Darla Bannister and Correct Care Solutions are individually liable and

vicariously liable for the acts, inactions, or omissions of their employees and agents for compensatory damages and punitive damages for medical negligence and negligence in operating a medical facility.

## COUNT VII

## NEGLIGENT POLICIES, TRAINING, OR SUPERVISION

### (Defendants Darla Bannister and Correct Care Solutions)

186.   Plaintiff restates each of the preceding allegations as if fully stated herein.

187.   Defendants owed the duty to properly screen, hire, train, monitor, supervise, and/or discipline their employees and agents, and to ensure they were qualified, competent, and suitable to perform their respective jobs or roles.

188.   Defendants owed the duty to adopt and enforce appropriate policies, procedures, and protocols.

189.   Defendants breached their duties and were negligent in the screening, hiring, training, supervision, monitoring, and/or disciplining of their employees and agents.

190.   Defendants breached their duties and were negligent in failing to adopt and enforce appropriate policies, procedures, and protocols.

191.   Defendants' conduct constitutes negligence, recklessness, willful or wanton negligence, or intentional acts.

192.   Defendants' negligence, recklessness, willful or wanton negligence, or intentional acts caused or contributed to Andres's wrongful death, loss of chance, pain and suffering, and other damages.

193.    Defendants are individually liable and vicariously liable for the acts, inactions, or omissions of their employees and agents for compensatory damages and punitive damages for negligent policies, training, or supervision.

## JURY DEMAND

194.    Plaintiff restates each of the preceding allegations as if fully stated herein.

195.    Plaintiff hereby demands a trial by jury on all counts.

WHEREFORE, Plaintiff requests judgment as follows:

1.    All damages that are fair and just pursuant to the laws of the United States and in an amount supported by the evidence presented at trial;

2.    Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for emotional harm;

3.    Punitive damages in an as undetermined amount severally against the individual named Defendants;

4.    Reasonable costs and attorney fees incurred in bringing this action; and for

5.    Such other and further relief as the Court deems just and proper.

THE SPENCE LAW FIRM NM, LLC


/s/ Alisa C. Lauer
Dennis K. Wallin
Alisa C. Lauer
1600 Mountain Rd. NW
Albuquerque, NM  87104
505.832.6363
wallin@spencelawyers.com
lauer@spencelawyers.com

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Aaron Garret, as Wrongful Death Representative for the
Estate of Andrew Montanez-Garcia, deceased

**DEFENDANTS**

Board of County Commissioners of the County of Eddy,
New Mexico, et al.

**(b)** County of Residence of First Listed Plaintiff   Eddy
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Eddy
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

The Spence Law Firm NM, LLC
Dennis K. Wallin

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government
     Plaintiff
- [X] 3  Federal Question
     *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government
     Defendant
- [ ] 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [X] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Federal Civil Rights Claim & Pendent State Claims

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
12.30.2020

SIGNATURE OF ATTORNEY OF RECORD
*Alisa C. Lauer*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____